IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CONNIE LOU SPARMAN, | ) | |
| *individually and in her capacity as* | ) | |
| *legal guardian and next friend of* | ) | |
| *D.W., a minor child,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  2:13-cv-00521-TMP |
| | ) | |
| BLOUNT COUNTY BOARD | ) | |
| OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

## SECOND MEMORANDUM OPINION ON SUMMARY JUDGMENT

This cause is once again before the court on the Motion for Summary Judgment filed by defendant Blount County Board of Education on October 27, 2014.  (Doc. 51).  In an Order issued on February 9, 2015, the Motion for Summary Judgment was granted pending the plaintiff's exhaustion of administrative remedies.  (Doc. 70).  The plaintiff since has exhausted those remedies, and the court's previous order was vacated on December 9, 2015.  (Doc. 82).  The parties were allowed to file supplemental briefs regarding the Motion for Summary Judgment and to conduct necessary additional discovery.  Supplemental discovery and briefing having concluded, the Motion for Summary Judgment is ripe to be taken under submission on the merits.  The court has considered the evidence and arguments set forth by both parties, and the parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) (Doc. 7).

## PROCEDURAL HISTORY

The instant case was filed on March 19, 2013, at which time there were two plaintiffs, Connie Lou Sparman and Martha Lynn Vanzandt.   All parties consented to dispositive magistrate judge jurisdiction on June 5, 2013.   The case was referred to mediation on November 19, 2013, and the parties moved for a court-conducted settlement conference on December 1, 2014.  The parties filed joint status reports regarding the progress of mediation and settlement proceedings on March 20, 2014; April 4, 2014; April 25, 2014; and May 2, 2014. Mediation and settlement negotiations resulted in the settlement of all claims by plaintiff Vanzandt.

Plaintiff Sparman filed her Amended Complaint on June 20, 2014.  (Doc. 25).  After a discovery period that was extended once at the parties' request, the defendant filed a Motion for Summary Judgment.  (Doc. 33).  The plaintiff filed a motion for a hearing, which was granted. The hearing was not held, however, because the issue the plaintiff wished to raise was resolved. The plaintiff moved to file excess pages (doc. 36) and, in response, the defendant notified the court that there was no objection to the plaintiff filing excess pages so long as the defendant could file a substitute motion containing excess pages (doc. 48).  The court granted both motions. (Doc. 50).

The defendant filed a substitute Motion for Summary Judgment on October 27, 2014. (Doc. 51).  The plaintiff moved to strike from the Motion for Summary Judgment the Affidavit of Shannon Lakey, and the court granted in part and denied in part the motion.  (Docs. 54, 67). The plaintiff filed a response in opposition to the Motion for Summary Judgment on November 14, 2014 (doc. 60), and the defendant replied on December 1, 2014 (doc. 65).  The

plaintiff moved for a hearing regarding the Motion for Summary Judgment, which was held on December 11, 2014.   (Doc. 65).   The court granted the defendant's Motion for Summary Judgment on February 9, 2015, for failure to exhaust administrative remedies.  (Doc. 70).  The court stayed the case to allow the plaintiff to exhaust such remedies and, upon exhaustion, the court vacated its Order on December 9, 2015.  (Doc. 82).  The court allowed the parties until January 6, 2016, to respond to any additional discovery requests, and until January 15, 2016, for the defendant to file additional evidentiary material and a supplemental brief in support of the Motion for Summary Judgment.  (Doc. 82).  The plaintiff was allowed to file a responsive brief no later than January 29, 2016, and any reply by the defendant was due no later than February 5, 2016.  (Id.)

The defendant filed the record of the Administrative Due Process Proceeding and a supplemental brief regarding the Motion for Summary Judgment on January 15, 2016.  (Docs. 83, 85).  In response, the plaintiff moved for another hearing on the Motion for Summary Judgment, which the court granted.  (Docs. 86, 87).  The plaintiff did not file a written response to the defendant's brief.  The motion hearing was held on February 24, 2016.  On March 17, 2016, the court directed the parties to file briefs regarding the plaintiff's allegations that the defendant failed to accommodate D.W.'s asthma-induced panic attacks, discriminated against D.W. by refusing to allow him to check out library books on his grade level, and required D.W. to shorten his lunch period to receive special education services.  (Doc. 89).  The parties were allowed until April 7, 2016, to file initial simultaneous briefs, and until April 14, 2016, to file reply briefs.  Each party filed a brief on the deadline, and the defendant filed a reply brief on

April 14, 2016.  (Docs. 90, 91, 92).  The Motion for Summary Judgment then was taken under submission.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 47 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting former Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-252; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981)[1]; a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004).  If the non-movant's evidence is so thoroughly discredited by the rest of the record

---

[1]  In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981)(en banc), the Eleventh Circuit Court of Appeals adopted as precedent decision of the former Fifth Circuit rendered prior to October 1, 1981.

evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).

Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).  Utilizing these standards, the court undertakes the analysis of whether the defendant has shown that it is entitled to judgment as a matter of law.

As part of the administrative hearing process held by the Alabama Department of Education, the administrative hearing officer made extensive findings of fact regarding the plaintiff's claim under the Individuals with Disabilities Education Improvement Act of 2004 (IDEA).  When reviewing an administrative decision under IDEA, the Third Circuit, taking instruction from the Tenth and Fourth Circuits, has held that the administrative decision is subject to a modified *de novo* review by the district court.  S.H. v. State-Operated School District

of Newark, 336 F.3d 260, 270 (3d Cir. 2003).  Because the case at bar is not an appeal of the

administrative IDEA determination, but a discrimination suit under the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 1983, and Section 504 of the Rehabilitation Act, the court

is more concerned with the factual findings of the administrative hearing than the legal findings.

Ultimately, the court concludes that the factual findings by the administrative hearing officer are

not binding on this court and, indeed, not admissible for any purpose in the action.[2]

The purpose of an administrative hearing under the IDEA is different from the object of a

claim of discrimination under the Rehabilitation Act, the ADA, and § 1983.  The IDEA seeks to

determine and assure that every child receives a "Free Appropriate Public Education," or FAPE.

It does not a vehicle for damages, nor does it require a showing of deliberate or purposeful

discrimination.  As the Middle District of Alabama has explained:

> To prove discrimination in the education context, courts have held that something
> more than a simple failure to provide a FAPE under the IDEA must be shown.
> *N.L. ex rel. Ms. C. v. Knox Cnty. Sch.*, 315 F.3d 688, 695 (6th Cir. 2003); *Estate
> of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 992 (5th Cir. 2014).  "A
> plaintiff must also demonstrate some bad faith or gross misjudgment by the
> school or that he was discriminated against solely because of his disability.*"  K.I.
> ex rel. Jennie I. v. Montgomery Pub. Sch.*, 805 F.Supp.2d 1283, 1292 (M.D.Ala.
> 2011) (quoting *W.C. ex rel. Sue C. v. Cobb Cnty. Sch. Dist.*, 407 F.Supp.2d 1351,
> 1363–64 (N.D.Ga. 2005)).  A plaintiff must prove that he or she has either been
> subjected to discrimination or excluded from a program or denied benefits by
> reason of their disability.  *Sellers by Sellers v. Sch. Bd. of City of Mannassas, Va.*,
> 141 F.3d 524, 528–29 (4th Cir. 1998).  A school does not violate § 504 "by
> merely failing to provide a FAPE, by providing an incorrect evaluation, by
> providing a substantially faulty individualized education plan, or merely because
> the court would have evaluated a child differently."  *Mrs. H.*, 784 F.Supp.2d at
> 1263 (citation and quotation omitted).  The deliberate indifference standard "is a
> very high standard to meet."  *Id.* at 1268.

---

[2]  Of course, the sworn testimony given by witnesses at the hearing, as distinct from the factual
conclusions reached by the hearing officer, may be used consistent with the Federal Rule of
Evidence.

J.S. v. Houston County Bd. of Education, 120 F. Supp. 3d 1287, 1295 (M.D. Ala. 2015). Because the object and purpose of an IDEA administrative hearing is very different from the assessment of whether a school board has engaged in deliberate or purposeful discrimination, the factual findings made by the administrative hearing officer not only address other concerns, but may actively mislead the jury or other fact-finder in a related § 504, ADA, or § 1983 action for damages. For this reason, the conclusions in the administrative hearing are not admissible in a related lawsuit for discrimination. As one court has expressed:

> The administrative decision repeats many of the same facts both parties must attempt to prove at trial, and, if taken at face value, a jury might erroneously construe it as foreclosing deliberation on these points. This would have the effect of usurping the role of the trier of fact, the risk of which is to be avoided if at all possible. Indeed, the Court conceives of little reason (other than the hope that the jury would follow the hearing officer dutifully) for offering the evidence in the first instance. Additionally, a jury could be likely to give undue weight to the decision of a government agency, particularly one that determined that the School District denied Ferren a FAPE for three consecutive years…. Exacerbating the likely prejudicial impact of the administrative decision is the disparity of the burdens of proof between Hearing Officer Mullaly's administrative decision and the instant civil suit. Even with a limiting instruction, the differing burdens of proof would likely confuse a jury and lead it to give undue weight to the hearing officer's findings of fact. In sum, the admission of the administrative decision could, and likely would, confuse, mislead, and prejudice the jury.

Chambers v. School Dist. of Philadelphia Bd. of Education, 827 F. Supp. 2d 409, 420 (E.D. Pa. 2011), rev'd on other grounds, 537 F. App'x 90 (3d Cir. 2013).[3]

_____

[3] The Third Circuit expressly affirmed the district court's rejection of the admissibility of the findings of fact made by the administrative hearing officer. See Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 537 F. App'x 90, 95 (3d Cir. 2013).

## FACTS

Viewing the evidence favorably to the non-moving plaintiff, the following facts appear to be undisputed.  The plaintiff, Connie Lou Sparman, has raised her grandson, D.W., from early childhood and is his legal guardian.[4]  D.W. is a young man who is now a high school student at J.B. Pennington High School in the Blount County school system.  He has attended Blount County schools for the entirety of his academic career.  First, he attended Blountsville Elementary School and then, in the seventh grade, transitioned to J.B. Pennington for the 2013-2014 school year.  The president of the Blount County Board of Education ("the Board") is Gregg Armstrong.  At all relevant times, Sharon Lakey served as the principal of Blountsville Elementary School, and Kenneth Clay served as the vice principal.  At all relevant times, Brian Kirk was the principal of J.B. Pennington High School, and Steven Bryson was the vice principal.  James E. Carr, Craig Johnson, Chris Latta, Bruce McAfee, and Jackie T. Sivley all were members of the Board.

D.W. has had an individualized education plan (IEP) since the second grade, originally for a speech disorder, but later designated a "specific learning disability," after an evaluation suggested a diagnosis of dyslexia.  Based on his plan, D.W. has received special education services.  At one time or another, he has been diagnosed with dyslexia, over-anxious disorder, and dysthymic (mild depression) disorder.  He also suffers from asthma.  D.W. takes prescription medicine for all of those conditions, and undergoes psychological counseling with a psychiatrist.  Due to his dyslexia, D.W. is not able to read at grade level, and this causes other children to tease

D.W. has been subjected to bullying by other students since the first grade.  This typically

---

[4]   At some points in this memorandum opinion, the plaintiff may be referred to as D.W.'s parent.

involved physical pushing, hitting and pinching as well as name calling and teasing, mostly during lunch and his physical education (P.E.) class. It sometimes occurred in the hallway and the classroom. Both D.W. and plaintiff have reported the bullying to school officials and teachers repeatedly, including the principal, Ms. Smallwood.

As a result, D.W. began to dread going to school and he resented plaintiff for making him go to school. Throughout this time, D.W. and plaintiff complained to school officials about D.W.'s treatment by other students.

Prior to 2009, the Blount County Board of Education had a policy dealing with bullying. It was revised on May 2, 2009, to read as follows:

> The Blount County Board of Education is committed to protecting its students and employees from bullying, harassment, or discrimination of any type. The school board believes that all students and employees are entitled to a safe, equitable, and harassment-free school experience. Bullying, harassment, or discrimination will not be tolerated and shall be just cause for disciplinary action. This policy shall be interpreted and applied consistently with all applicable state and federal laws. Conduct that constitutes bullying, harassment or discrimination, as defined herein, occurring on school property during the school day or at school-sponsored events is prohibited. The use of school equipment for the purpose of these actions is also prohibited.

(Doc. 52-3, Exh. 4 to Depo of Sosebee). The policy goes on to define the term "bullying" as follows:

> **"Bullying"** means systematically and chronically inflicting physical hurt or psychological distress on one or more students or employees. It is further defined as unwanted purposeful written, verbal, nonverbal, or physical behavior, including but not limited to any threatening, insulting, or dehumanizing gesture, by an adult or student, that has the potential to create an intimidating, hostile, or offensive educational environment or cause long term damage; cause discomfort or humiliation; or unreasonably interfere with the individual's school performance

or participation, is carried out repeatedly and is often characterized by an imbalance of power.

Bullying may involve, but is not limited to:
1.   unwanted teasing
2.   threatening
3.   intimidating
4.   stalking
5.   cyberstalking
6.   cyberbullying
7.   physical violence
8.   theft
9.   sexual, religious, or racial harassment
10.   public humiliation
11.   destruction of school or personal property
12.   social exclusion, including incitement and/or coercion
13.   spreading of falsehoods

(<u>Id.</u>).  Further, "harassment" is defined by the policy:

**"Harassment"** means any threatening, insulting, or dehumanizing gesture, use of technology, computer software, or written, verbal or physical conduct directed against a student or school employee that:
1.   places a student or school employee in reasonable fear of harm to his or her person or damage to his or her property;
2.   has the effect of substantially interfering with a student's educational performance, or employee's work performance, or either's opportunities, or benefits;
3.   has the effect of substantially negatively impacting a student's or employee's emotional or mental well-being; or
4.   has the effect of substantially disrupting the orderly operation of a school.

(<u>Id.</u>).  Paragraph E. of the policy expressly made the definitions of "bullying" and "harassment" including any retaliation against a student or employee for making a complaint about harassment or bullying.  Likewise, Paragraph F. of the policy defined both "bullying" and "harassment" to include "unwanted harm towards a student or employee in regard to their real or perceived… disability (physical, mental, or educational)…."

11

This policy was further revised on April 4, 2011, to establish a systematic procedure for making and investigating complaints of bullying and harassment.  This added revision stated:

### G.  Reporting, Investigating, and Complaint Resolution Procedures

a. Complaints alleging violations of this policy must be made on Board approved complaint forms available at the principals and/or counselor's office.  The complaint must be signed by the student alleging the violation or by the student's parent or legal guardian and delivered to the principal or the principal's designee either by mail or personal delivery.  At the request of the complaining student or the student's parent or legal guardian, incidental or minor violations of the policy may be presented and resolved informally.

b. Upon receipt of the complaint, the principal or the principal's designee will, in their sole discretion, determine if the complaint alleges a serious violation of this policy.  If the principal or the principal's designee determines that the complaint alleges a serious violation, the principal or the principal's designee will undertake an investigation of the complaint.  The investigation will entail the gathering of relevant facts and evidence and will be conducted in a reasonably prompt time period taking into account the circumstances of the complaint.  If the investigation establishes a violation, appropriate disciplinary sanctions will be imposed on the offending student(s).  Other measures that are reasonably calculated to prevent a recurrence of the violation(s) may also be imposed by the principal or the school system.

c. Acts of reprisal or retaliation against any student who has reported a violation of this policy or sought relief provided by this policy are prohibited, and are themselves in violation of this policy.  Any confirmed acts of reprisal or retaliation will be subject to disciplinary sanctions that may include any sanction, penalty, or consequence that is available to school officials under the Code of Student Conduct. A student who deliberately, recklessly, and falsely accuses another student of a violation of this policy will be subject to disciplinary sanctions as outlined in the Code of Student Conduct.

d. The complaint form developed to report violations of this policy will include a provision for reporting a threat of suicide by a student.  If a threat of suicide is reported, the principal or the principal's designee will inform the student's parent or guardian of the report.

(Id.).   The policy was included in student handbooks distributed at the beginning of each school year.  Students and parents were required to sign an acknowledgement that they had received and

read the handbook.  Although plaintiff testified that she usually was required to sign the acknowledgement and leave the handbook at the school each year, she also testified that she eventually received a copy by the time of D.W.'s fifth-grade year.  (Doc. 52-6, Depo of Sparman, at p. 97).

As D.W. got older, his bullying by other students became worse in the fourth and fifth grades at Blountsville Elementary School.  He began to experience nightmares and bedwetting at that time.  Students teased him about his weight, calling him "fatso" and other vulgar names,[5] and about his difficulty reading.  Despite verbal complaints to school officials, the bullying continued, resulting in D.W. starting counseling to deal with the stress.  During D.W.'s fourth grade year (2010-2011), Shannon Lakey took over as principal as Blountsville Elementary School, and plaintiff complained to her about the bullying and teasing.  It was near the end of that academic year, in April 2011, that the defendant Board revised its policy to establish a specific procedure for reporting and investigating allegations of bullying and harassment.

On one occasion during the 2011-2012 school year (D.W.'s fifth grade), a group of male students drenched D.W. with water in the bathroom, and when D.W. told his teacher about the episode, he was told to sit down and shut up.  Later the teacher made him clean up the water on the floor in the bathroom.   Plaintiff verbally complained about the incident to Ms. Lakey (but did not file a formal written complaint), who said she would investigate.  Ms. Lakey interviewed the teacher involved, who reported that D.W. was alone in the bathroom and that he splashed water on himself.  Plaintiff asserts that nothing was done about her complaint of harassment, and

---

[5]    D.W. testified by affidavit that he has been called "fatso," "retard," "stupid," "dog killer," "crybaby," and other vulgar names, such as "faggot," "bitch," "fag," and "fucker."  (Doc. 61-3).

when she asked Ms. Lakey about the results of her investigation, was told simply that Ms. Lakey "handled it."

Also while D.W. was in the fifth grade, on February 22, 2012, he was attending a beauty-pageant rehearsal at J.B. Pennington High School with several other male students.   While standing in the back of the auditorium, they were making whistling sounds.   Plaintiff testified that it was her understanding that D.W. was showing the other boys how to whistle.[6]  A teacher approached D.W. and "yanked" him by the arm, telling him to be quiet.   He required medical attention the next day for a shoulder injury.[7]  Plaintiff made a verbal complaint (but not a written complaint) to Ms. Lakey, who interviewed the teacher involved.   The teacher confirmed that she discipline D.W. for making noise during the rehearsal, but denied "yanking" his arm.   The teacher stated that she touch him on the back while telling him and the other male students to be quiet.

In May 2012, plaintiff again complained that a substitute P.E. teacher refused to allow D.W. to use an inhaler for his asthma.   After plaintiff met with the substitute and informed him that D.W. had asthma, he was allowed to use his inhaler. (Doc. 83-5, ALDE Admin. Hearing Transcript, Testimony of Sparman, pp. 411-412).

During D.W.'s sixth-grade year (2012-2013), bullying and harassment by other students continued.   In September 2012, while riding the bus and again during lunch, a student who lived near D.W. called him a "dog killer."   When plaintiff complained, Principal Lakey informed all

---

[6]   "They went to the high school for a beauty pageant[,] something or another going on down there, getting the girls ready for a beauty pageant.  Him and his friends was standing back at the back.  Some of the boys was trying to learn how to whistle.  [D.W.] was trying to show them how to whistle."  (Doc. 52-6, Sparman Depo., at p. 17).

[7]

teachers to make sure that D.W. and the other student were kept separated.  She also discussed the matter with the bus driver to make sure the students were separated on the bus.  (Doc. 83-9, ALDE Admin. Hearing Transcript, Testimony of Lakey, pp. 1068-1069).

On October 12, 2012, plaintiff met with Superintendent Carr to discuss her concerns about the bullying of her grandson.  On October 15, Carr met with the Lakey and various other teachers and staff at D.W.'s school, all of whom reported that they had not observed D.W. being a victim of bullying, but rather, an active participant in several altercations and disagreements. Carr then called in Sosebee, the board official tasked with administering safety programs to look into ways to allay plaintiff's concerns for D.W.'s safety.  (Doc. 83-20, at. pp. 4-6).  On October 17, 2012, Sparman and Sosebee met, during which plaintiff recounted a number of instances of alleged bullying and indifference by school officials.  (Doc. 83-20, at pp. 8-11).  As a result of that meeting, it was agreed that Sosebee would develop a plan to address the alleged bullying of D.W.

As a result, midway through D.W.'s sixth-grade year, on December 5, 2012, school officials met with plaintiff and drafted a Student Safety Plan for D.W.  (Doc. 83-18).  The Plan, signed by plaintiff and school officials, reads as follows:

> It has been reported to BES by Connie Sparman that her grandson, [D.W.], suffers from bullying.  While these acts have not been witnessed directly by school personnel we take them very seriously and want to ensure [D.W.'s] safety.  The safety of all students is of utmost importance at BES.
>
> **School**:
>
>   • Ensure that general, physical, special educators and all staff share the responsibility for implementing the intervention  strategies
>   • School leadership will create a "no contact" contract for the students involved in a given situation reported by [D.W.]

• The parent/guardian will be contacted if a report of bullying or an incident of violence occurs with the student
• Staff will be identified within the building for the student to report bullying incidences to directly.
• Teachers and staff will work with student to develop a relationship so that the student feels safe reporting these incidences
• On a regular basis, the counselor and resource teacher will check in with student to determine if he is feeling safe or experiencing any problems.
•· When an incidence occurs that warrants counseling our counselor will speak with all students involved.
• Teachers and staff will report any actions that might be considered bullying to the school leadership or the counselor so that the appropriate responses can occur in a timely manner.

**Student:**

• Meet with counselor to develop self-advocacy to obtain help and to build skills to guard against violence
• Student will report any future incidents to the counselor, homeroom teacher or resource teacher immediately so that the appropriate responses can occur in a timely manner and communications with the parent/guardian can occur.  Dustin will use a copy of the attached incident report.
• Student must adhere to the "no contact" for the students involved.

**Parent/Guardian**:

• Encourage Dustin to build relationship with counselor so that he develops a sense of trust and an increased comfort in communicating with the school.
• Routinely speak with child regarding school and if any new incidents occur, contact the principal/assistant principal immediately.

(Id.).

The next day, December 6, 2012, D.W. submitted an incident report in which he reported that a thrown highlighter landed on his desk and as he picked it up, a female student hit him twice.   (Doc. 83-22, at p. 1 of 60).   School Counselor Hays investigated the report by

interviewing D.W. and the teacher.  The teacher reported that D.W. told her about the incident and she moved the female student to the other side of the classroom to separate her from D.W. (Id., at pp. 1 and 19 of 60).  D.W. also reported to Hays that the female student called him a tattletale and a cry baby and made whimpering sounds toward him, but the teacher reported not seeing any of this.  (Id.).

On December 14, 2012, plaintiff turned in three incident reports for D.W.  One dated December 7, 2012, (Doc. 83-22, at p. 3 of 60), reported that another student, E.S., called D.W. a "dog killer" and accused him of killing the next-door neighbor's dog.  The second, dated December 10, reiterated the complaint D.W. made on December 6 that a female student hit him as he picked up a highlighter. The third, dated December 13, alleged that E.S. had hit D.W. in the back during a game of basketball in P.E. class.

To investigate the December 7 incident report, the teacher asked both students what was said, and E.S., the student accused by D.W., denied that he said anything to D.W.   On December 14, 2012, the teacher wrote on the incident report the following information:

> Document in [D.W.'s] Notebook that is located in Mrs. Dorning's Data Box.  The [sic] occurred happened on 12-10-12 (Monday) not the 7th.  I didn't just tell D.W. to forget about it.  I asked D.W. to tell me exactly what was said.  [The other student] denied it then D.W. stated he made a cross w/ his fingers.  I could not prove anything and told BOTH boys to not say anything if they couldn't say anything nice.

(Id.).

On with respect to the December 13, incident report, plaintiff Sparman alleged that E.S., the same student who allegedly called D.W. a "dog killer," hit him in the back while D.W. was playing basketball.  (Doc. 83-21, at pp. 47-48).  The student denied hitting D.W.  The same day

the report was filed, December 14, Principal Lakey interviewed a witness identified by plaintiff as a friend of D.W.'s, but the witness said he was not sure if E.S. hit D.W. on purpose.  "He said he thought it was an accident."  (Id.).

In March of 2012, D.W. was involved in an altercation with another student during P.E. class.  Lakey interviewed D.W., the other student, and witnesses to the event.  She concluded that D.W. started the altercation by hitting the other student first, who then reacted, striking D.W.

Near the end of the 2012-2013 school year, on April 15, 2013, plaintiff made a made to the Blountsville Elementary School resource officer (a Blount County sheriff's deputy) to document the ongoing bullying of her grandson.  Specifically, she alleged that some students had fashioned a "shank" (a homemade knife) and had threatened D.W. with it.  Assistant Principal Clay told Principal Lakey about the report, and Lakey began an investigation.   According to her investigation, the incident had occurred more than two months before the report, on February 8.  Also, Lakey discovered that the "shank" actually was aluminum foil folded into the shape of knife.  (Doc. 83-11, ALDE Admin. Hearing Transcript, Testimony of Lakey, pp. 1337-1343).

The teasing and bullying became worse yet again in the fall of 2013, when D.W. entered the seventh grade and transitioned to J.B. Pennington High School, which includes grades seven through twelve.  His resentment toward plaintiff increased and he became angry at her for making him go to school every day.  He would react at home in an angry manner toward his grandmother and sister due to events at school.  He was undergoing psychological counseling.

On October 16, 2013, plaintiff filed an offense/incident report to document several events occurring between October 3 and 16.  Plaintiff alleged in the report that, on October 3, 2013, D.W. was "pantsed," i.e. had his pants pulled down, by several male students.  On another

occasion, two students pulled D.W. out of a chair, causing him to fall to the floor and bruise his hip.  Later still, while at a pep rally with plaintiff, a student attempted to push D.W. down while they were on the bleachers.  Finally on October 11, at a football game, D.W. was playing in a pick-up football game when another student in the game pulled D.W. to the ground and punched him in the face.  Each of these events was investigated.  The assistant principal at J.B. Pennington investigated the "pantsing" and determined that several male students, including D.W., were pulling down each other's pants.  Assistant Principal Bryson explained to the boys that such conduct could be considered sexual harassment for disciplinary purposes.

The more serious event was the punch during the pick-up football game on October 11, 2013.  The "tussle" between D.W. and the other student was broken up by a parent, who took the boys to Assistance Principal Bryson.  The student involved was later disciplined, being given a two-day, in-school suspension for the infraction.  (Doc. 83-9, ALDE Admin. Hearing Transcript, Testimony of Bryson, p. 983).  Bryson did not consider the incident bullying because it was a one-time evert between students who did not know each other; it was not systematic or ongoing. (Doc. 83-20, ALDE Admin. Hearing exhibit, at p. 30).

On January 21, 2014 a pediatric nurse with the Department of Psychiatry at the University of Alabama at Birmingham wrote the principal at D.W.'s school, advising that D.W. had disclosed to the pediatric nurse that he [w]as the victim of the bullying at the high school. The nurse wrote "I advise that this matter be addressed promptly specifically because it has become a health concern for [D.W.]"  She added further: "We feel that no child should have to go to school expecting to be harassed and taunted.  Problems at school have started to effect [D.W.] emotionally and academically."  (Doc. 83-17, ALDE Admin. Hearing exhibit, p. 9).

On January 23, 2014, D.W. reported that another student whose identify he was unsure of called him a "dog killer."  Although Petitioner could not identify the person who had called him the name, a school system investigation identified the student, N.A., through video surveillance tape.  Upon questioning, N.A. explained that another student, E.S., told him that D.W.'s grandfather had killed a neighbor's dog, and N.A. stopped D.W. to ask if it was true.  N.A. and D.W. then met with the high school principal and assistant principal, where N.A. apologized and he and D.W shook hands.  (Doc. 83-21, ALDE Admin. Hearing exhibit, p. 1).  There were no further incidents between the two students.

On April 17, 2014 D.W. told the high school principal that J.K. distracted him at lunch while another hit him Petitioner in both ears.  The assistant principal interviewed J.K., who stated that he and three other students were tapping each other's ears, but that no one touched D.W.   No other student alleged to be present could confirm the D.W.'s version of that occurrence.  (Doc. 83-20, ALDE Admin. Hearing exhibit, p. 34).

At that same time on April 17, D.W. also reported that, about three weeks before, student D.M. had shoved him toward a sawblade in their agriculture class.  The assistant principal interviewed D.M., the accused student, who denied doing so, and two other students who denied any knowledge of such an event.  (Doc. 83-8, ADLE Admin. Hearing Transcript, Testimony of Bryson, pp. 1002-1003).[8]  The teacher in the class also denied any knowledge of such an event.

---

[8]   As in other instances through the facts of this case, the court has accepted the evidence and testimony of school officials not as evidence relating to the truth of D.W.'s underlying accusations, but as evidence relating to the investigation and other steps undertaken in response to the accusations.  School officials have direct, personal knowledge of the steps they took in response to a complaint by D.W., and knowledge of what they were told by witnesses.  While the statements of witnesses to them cannot be used to prove the truth of what the witnesses said, it is factual evidence of what information the school officials possessed (whether accurate or not) on

D.M. was told to avoid D.W. and to be a positive influence on people.  (Doc. 83-20, ALDE Admin. Hearing exhibit, p. 34).

In August of 2014, D.W. entered the eighth grade at J.B. Pennington High School.  There were two incidents of alleged bullying of D.W. on September 12, 2014, reported by plaintiff using the approved complaint form.  In one, D.W. alleged that anther student sitting with him at lunch started calling him "fat."   Assistant Principal Bryson investigated the next day, interviewing the accused student, who reported that he and D.W. were friends and often called each other names in jest.  He reported that D.W. frequently called him "Mexican."  (Doc. 83-18, ALDE Admin. Hearing exhibit, p. 25).  The student was told not to call D.W. names.

The second occurrence took place in a classroom.  D.W. reported that another student was throwing an eraser and hitting D.W. in the back with it.  D.W. told the student to stop, and he did.  Bryson interviewed the student, who reported that he and D.W. were friends and often did playful things to irritate each other.  D.W. sometimes tried to take the student's glasses.  (Doc. 83-18, ALDE Admin. Hearing exhibit, p. 26).  The student was told not to name call or throw things in class.  (Id.).

On October 1, 2014, D.W. reported that he was struck in the right ear by E.S. (the same student with whom D.W. had had earlier problems) while in the lunchroom.  (Doc. 83-18, ALDE Admin. Hearing exhibit, p. 35).  Plaintiff testified that when D.W.'s ear continued to hurt, she took him to a doctor, who diagnosed a "burst" eardrum.  She filled out a complaint form about the incident on October 2, 2014, and delivered it to Mr. Bryson the next day.  (Id.).  She also made a report of the incident to law enforcement.  When the assistant principal confronted E.S.,

which they made their decisions and took actions.  The reasonableness of their decisions and actions turns at least in part on what they were able to determine about D.W.'s complaints.

he denied hitting D.W., but Mr. Bryson was able to confirm through other witnesses that the denial was untrue.  (Id.).  The student who struck D.W. was placed in detention and instructed to avoid contact with him.  (Bd. 11).  Also, on October 14, 2014, the assistant principal emailed staff to be particularly attentive to interaction between D.W. and E.S. in that plaintiff had complained that E.S. had bullied D.W. throughout her grandson's enrollment in Blount County schools.  (Doc. 83-21, ALDE Admin. Hearing exhibit, p. 2).

On October 28, 2014, a new Student Safety Plan was adopted for D.W. at J.B. Pennington High School during D.W.'s IEP meeting.  The new Student Safety Plan read:

> Connie Sparman, [D.W.'s] grandmother and guardian, has reported that [D.W.] suffers from bullying at J.B. Pennington High School.  The teachers, staff, and administration take this seriously and want to ensure [D.W.'s] safety.
>
> School:
>
> > • Ensure that all staff members share the responsibility for implementing the intervention strategies.
> > • The guardian will be contacted if a report of bullying occurs with [D.W.].
> > • [D.W.] will report bullying incidences directly to Tina Wynn, resource teacher, she will fill out incidence report and turn into Steven Bryson, vice-principal.
> > • Staff members will work with [D.W.] to develop a relationship so that he feels safe reporting these incidences.
> > • The school counselor will check in weekly (Thursday morning) with [D.W.] to determine if he is feeling safe or experiencing any issues.
> > • When an incidence occurs that warrants counseling, the school counselor and administration will speak with all students involved.
>
> Staff members will report any actions that might be considered bullying to the school administrators or school counselor so that the appropriate responses can occur in a timely manner.

Student:

> • Meet with school counselor (every Thursday morning) to develop self-advocacy to obtain help and to build skills to guard against violence.
> • Will report incidents to the school counselor or resource teacher immediately so that appropriate responses can occur in a timely manner.

Parent/Guardian:

> • Encourage [D.W.] to build relationship with counselor and staff members so that he develops a sense of trust and an increased comfort in communication.
> • Routinely speak with Dustin regarding school and if any new incidents occur, contact the administration immediately.

(Doc. 83-18, ALDE Admin. Hearing exhibit, pp. 37-38).  On that same day, October 28, 2014, D.W. filed a new complaint form, alleging that another student, J.H., was annoying him by following him around school.  (Doc. 83-8, ALDE Admin. Hearing Transcript, Testimony of Bryson, p. 1007).  J.H. was placed in isolation and Alternative Behavior Education. D.W. testified at the ALDE hearing that the school's action stopped the student for a while, but he later resumed annoying D.W.   On November 4, D.W. complained that J.H. was sitting next to him in P.E.  Teachers were instructed not to allow the two to sit together.  (Doc. 83-18, ALDE Admin. Hearing exhibit, p. 16).

On November 20, 2014 while D.W. was playing tag with another student in their P.E. class he fell on a third student, who curse and shoved D.W.  That student was counseled about the use of profanity.  D.W. was shown a surveillance video of the event and agreed that it depicted him engaging in dangerous horseplay.  He was told by staff not to engage in horseplay. (Doc. 83-18, ALDE Admin. Hearing exhibit, p.17).

Although the March 23, 2015, IEP described that there were no incidents of bullying after November 20, 2014, D.W. testified that there were actually several occurrences where he was shoved, called names, or believed himself to be the victim of bullying.  He was emphatic that these events were reported by either the plaintiff or himself to school system personnel.  These incidents were not documented by filling out (or having the special education teacher fill out) the bullying complaint form.

The plaintiff asserts that she provided medical records to the Blount County school system regarding D.W.'s asthma, and provided inhalers to the school for his use during the 2012-2013 school year.  She further asserts that each time she complained to Shannon Lakey, the principal of Blountsville Elementary School at the relevant time period, about D.W. being bullied, Lakey refused to answer any follow-up questioned posed by the plaintiff.  The plaintiff asserts that D.W.'s IEPs omit comments and complaints that the plaintiff made during the IEP meetings.

With regard to her individual claim of loss of consortium, the plaintiff asserts that D.W. has anger toward her because the plaintiff makes him attend school.  (Doc. 60, ¶ 23).  She asserts that the stress of knowing that D.W. is being bullied on a daily basis has caused her to suffer a heart attack,[9] and that she is prescribed blood pressure and anxiety medication, the need for which was brought on by the stress surrounding D.W.'s school situation.  (Doc. 60, ¶¶ 24-25).  The plaintiff claims a loss of consortium because "she has to live with D.W. hating her because she makes him go to school where he is bullied."  (Doc. 60, ¶ 26).

---

[9]   In the plaintiff's deposition, she testifies that the heart attack occurred after she walked from her home to the school after hearing that a child had been hanged at J.B. Pennington High School.  She was concerned that the student was D.W.  (Sparman Depo., pp. 210-211, Doc. 61-1, p. 53).

**DISCUSSION**

In the Amended Complaint, the plaintiff asserts three claims on behalf of D.W. pursuant to the Americans with Disabilities Act ("ADA") and ADA Amendment Act 2008; 42 U.S.C. § 1983; and § 504 of the Rehabilitation Act, 29 U.S.C. § 749.  On her own behalf, the plaintiff asserts a claim for loss of consortium, although it is not clear whether this is asserted under state law or a federal statute.  Because the standards for establishing a claim under the ADA and § 504 are so similar, those claims will be discussed simultaneously, while the § 1983 claim and the loss of consortium claim will be discussed separately.

## I.  Americans with Disabilities Act and Section 504[10]

Title II of the Americans with Disabilities Act ("ADA") provides the protection that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in

---

[10]   In an Order dated March 17, 2016, the court directed the parties, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, to address specific claims in the Amended Complaint which were not addressed in other briefs relating to the Motion for Summary Judgment.  (Doc. 89). Those claims consisted of the plaintiff's claim under the ADA that the Board failed to reasonably accommodate D.W.'s asthmatic-induced panic attacks (doc. 25, ¶ 51) and the plaintiff's claims under § 504 of the Rehabilitation Act that D.W. was not allowed to check out library books at his grade level and was forced to reduce his allotted lunch time to receive special education (doc. 25, ¶¶ 70-72), as well as the plaintiff's loss of consortium claims.  The plaintiff filed her brief in response to this Order on April 7, 2016, but failed to address the specific factual claims as instructed by the court.  (Doc. 90)  Instead, the plaintiff reiterated her previous arguments. Because the plaintiff failed to properly defend those factual claims in any response to the Motion for Summary Judgment, the specific allegations set out above are deemed abandoned, and the defendant's Motion for Summary Judgment as it relates to the specific factual allegations under the ADA and § 504 set out herein is due to be GRANTED.  The plaintiff's claim of loss of consortium will be discussed, *infra*.

the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service….”  29 U.S.C. § 794(a).  The statute goes on to define “a local education agency” as a “program or activity” contemplated by § 504.  29 U.S.C. § 794(b)(2)(B).

### a.  Peer-on-Peer Harassment

In 1999, the United States Supreme Court created a five-part test for evaluating the liability of school boards under Title IX for peer-on-peer sexual harassment.  Davis v. Monroe County Board of Education, 526 U.S. 629, 633, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999).  That test since has been adopted by circuit courts to evaluate liability in the case of disability-based peer-on-peer harassment claims asserted under the ADA and § 504.[11]  See S.S. v. Eastern Ky. Univ., 532 F.3d 445, 454 (6th Cir. 2008); Long v. Murray Co. Sch. Dist., 544 Fed. Appx 576, 577 (11th Cir. 2013) (affirming the ruling of the district court and the use of the deliberate indifferent standard in the lower court).  To impose liability under the Davis standard, the plaintiff must show the following:

(1) D.W. is an individual with a disability,

(2) he was harassed on the basis of (that is, because of) his disability,

---

[11]   In the plaintiff's brief responding to the court's Order of March 17, 2016, she asserts a secondary standard set out in the Fifth Circuit case Stewart v. Waco Independent School District, 711 F.3d 513 (5th Cir. 2013).  The plaintiff does not allege, and it does not appear, that the Stewart standard has been adopted in this Circuit.  Therefore, the plaintiff's claim will be analyzed under the Davis standard, which clearly has been adopted by the Eleventh Circuit in cases of peer-on-peer disability harassment.  See Long v. Murray Co. Sch. Dist., 544 Fed. Appx. 576, 577 (11th Cir. 2013).

(3) the harassment was sufficiently severe or pervasive that it altered the condition of D.W.'s education and created an abusive educational environment,

(4) the defendant board of education knew about the harassment, and

(5) the defendant was deliberately indifferent to the harassment.

See S.S. v. Eastern Ky. Univ., 532 F.3d at 453.

There seems to be little argument in this case that prongs (1) and (4) of the Davis test are met. D.W.'s status as an individual with a disability has been well-known to the defendant, as evidenced by the multiple IEP's in the record, as well as the Alabama Department of Education administrative proceedings.

Also, it does not appear to be disputed that the Board was aware that D.W. was having issues with his peers at school. Although there is disagreement as to whether the confrontations D.W. experienced could properly be defined as bullying[12], "[t]he principal did say that the parent had made a number of complaints alleging that her grandson had been bullied." (Admin. Rec. p. 13). The disputes in this case seem to surround prongs (2), (3), and (5) of the Davis test. The defendant argues in the Motion for Summary Judgment that the plaintiff fails to provide sufficient evidence that the bullying D.W. experienced was on the basis of his disability, that the bullying was sufficiently severe or pervasive to alter the condition of D.W.'s education and create an abusive environment, or that the defendant board of education was deliberately indifferent to the bullying. (Doc. 51-1).

---

[12] Each person who testified for the school system at the administrative hearing stated that, although there had been events or altercations about which the parent or Petitioner complained, none rose to the level of bullying. The occurrences were neither frequent nor intense enough to be considered bullying. The elementary school principal and the assistant principal at the high school added that often D.W. initiated physical contact or engaged in verbal insults with other students. (Admin. Rec., p. 13).

###### i. Did D.W. suffer harassment *on the basis of* his disability

The defendant argues that there is insufficient evidence to support the claim that D.W. was bullied because of his disability.  The court looks to an analogous case decided in the United States District Court for the Middle District of Alabama for guidance.  Moore v. Chilton Co. Bd. of Educ., 1 F.Supp. 3d 1281 (M.D. Ala. 2014).  The parents of the student in Moore alleged that she was bullied because she walked with an altered gait as a result of Blount's Disease and because of her weight.  Moore, 1 F.Supp. 3d at 1296.  The court in Moore assumed without deciding that the student's Blount's Disease and obesity were disabilities under the ADA and § 504.  Id. at 1297.  In deciding whether the student was harassed on the basis of her disabilities, the court determined the following:

> In the first instance, the Board's argument ignores Virginia's [a friend of the student] deposition testimony that A.M.'s peers taunted her not only because she was overweight but also because of the way she walked.  Additionally, as discussed above, the court has assumed, without deciding, that A.M.'s limited mobility and weight qualify as ADA disabilities; hence, the Board's arguments challenging A.M.'s proof with respect to her disabilities have no force at this point.  The court declines, however, to resolve this element for or against the Board on summary judgment and instead finds that it suffices to assume without deciding that the harassment A.M. endured was based upon her disabilities.

Id. at 1297.

In the instant case, the plaintiff argues that D.W. "is routinely harassed verbally and physically and derided by name calling such as 'fatso', 'retard', 'bitch', 'dog killer', 'fucker', 'parentless', and 'faggot.'"  (Doc. 60, p. 37).  The plaintiff asserts that D.W.'s disabilities are

dyslexia and asthma, and that D.W. is harassed due to his asthma.[13]   (Id. pp. 36-37).  In support

of the argument, the plaintiff cites to her own deposition in which she testified that she has heard

D.W.'s classmates call him 'fatso' and 'retard.'  (Sparman Depo., Doc. 61-1, p. 239).  Sparman's

deposition does not shed any light on the motivation of the bullies – whether they tease D.W. due

to his disabilities or for some other reason.  However, at the summary judgment stage the court is

required to make all reasonable inferences in favor of the plaintiff.

The plaintiff has testified that, due to his dyslexia, D.W. has difficulty reading aloud in

class, leading other students to tease him.  She also testified that D.W.'s asthma medication was

the catalyst for the weight gain he experienced around the 4th of 5th grade.  D.W.'s weight gain

resulted in additional teasing by other students.  Although not all of the teasing that the plaintiff

and D.W. allege can be directly attributed to D.W.'s disabilities of dyslexia and asthma, the

plaintiff's testimony allows for a reasonable presumption that the symptoms of D.W.'s

disabilities served to make D.W. a target for peer harassment.[14]  Therefore, taking the facts in the

light most favorable to the nonmoving plaintiff, the court is comfortable assuming, without

deciding, that at least part of the peer harassment that D.W. was subjected to was on the basis of

his disability.

---

[13]   Although the plaintiff mentions that D.W. experienced a weight gain in the fourth or fifth grade, she does not argue that D.W.'s obesity is a disability as contemplated by the ADA or § 504.

[14]   Plaintiff Sparman also alleges that D.W. was harassed by teachers due to his asthma.  She points to an instance when his arm was "yanked" by a teacher during a beauty pageant rehearsal because he was making whistling noises.  Plaintiff's own testimony about this incident, however, was that D.W. was not making whistling noises due to asthma, but was trying to show other boys how to whistle.  This event was unrelated to any disability.  She also complains that on two occasions substitute teachers denied D.W. the opportunity to use his inhaler, but these were two isolated incidences that were corrected in short order and did not occur again.  There is no substantial evidence that teachers were deliberately indifferent to D.W.'s need to use his inhaler.

### ii. Was the harassment experienced by D.W. sufficiently severe or pervasive that it altered the condition of his education and created an abusive educational environment?

The plaintiff contends that she began to complain to school officials that D.W. was being bullied during his kindergarten year at Blountsville Elementary School, which is under the jurisdiction of the Blount County Board of Education.  She alleges that physical and verbal bullying has persisted from kindergarten throughout D.W.'s educational experience to the present.  (Doc. 60, p. 38).  The plaintiff also asserts that D.W. suffers from anxiety surrounding school.  During the fourth and fifth grades he began resisting school attendance, had nightmares, and experienced nighttime incontinence.  Beginning in the seventh grade, D.W. sought psychological counseling due to the bullying.  The defendant argues that because D.W. continued to advance from grade to grade, he cannot show that the bullying he experienced has been sufficiently severe and pervasive to alter the conditions of his education and create an abusive educational environment.  To support the argument, the defendant cites Board of Education v. Rowley, in which the Supreme Court determined that advancement from grade level to grade level and achieving passing marks "constitute an important factor in determining educational benefit" under the Education of the Handicapped Act.  458 U.S. 176, 202-203, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).

The court is not persuaded.  First, Rowley is not an ADA or § 504 case and, therefore, while the standards may be similar, they are not the same.  Second, though it is important to note that D.W. has been able to consistently progress from grade to grade, such an achievement is not determinative.  Even under Rowley, grade-to-grade advancement is only a factor to be

considered; it is not determinative.  A student may successfully advance from grade to grade in an abusive educational environment.  One does not preclude the other.

Even so, the "severe and pervasive" standard for assessing educational harassment is necessarily a heavy burden.  The Eleventh Circuit has explained in the context of a student-on-student *sexual* harassment case, the following:

> Student-on-student sexual harassment rises to the level of actionable Title IX discrimination only if the harassment is "sufficiently severe."  [*Davis v. Monroe County Board of Education*, 526 U.S. 629, 633, 119 S. Ct. 1661, 1666, 143 L. Ed. 2d 839 (1999)].  The plaintiff must establish not only that the school district was deliberately indifferent to known acts of harassment, but also that the known harassment was "so severe, pervasive, and objectively offensive that it denie[d] its victims the equal access to education that Title IX is designed to protect."  *Id*. at 651–52, 119 S. Ct. at 1675.

> The Court imposed this high standard to guard against the imposition of "sweeping liability."  *Id*. at 652, 119 S. Ct. at 1675–76.  Unlike an adult workplace, children "may regularly interact in a manner that would be unacceptable among adults."  *Id*. at 651, 119 S. Ct. at 1675.  Due to their immaturity, children at various ages will invariably engage in some forms of teasing, shoving, and name-calling that "target differences in gender."  *Id*. at 651–52, 119 S. Ct. at 1675.  Some risk of sexual harassment is inherent to the enterprise of public education, in particular, because public schools must educate even the most troublesome and defiant students.

Hill v. Cundiff, 797 F.3d 948, 968–69 (11th Cir. 2015).  Unfortunately, the same can be said of disability harassment and bullying.  Children say and do things that are plainly unacceptable to adults.  Nevertheless, such harassment and bullying must be so "severe" or "pervasive" that it effectively denies the targeted child of the equal educational opportunities available to all.  Day-to-day or trivial annoyances simply are not enough to form the basis of liability on the part of the school board.

The evidence favorable to the plaintiff shows that the bullying has persisted for the entirety of D.W.'s school career.  Furthermore, there is evidence of a negative psychological impact such that D.W. had to seek psychological counseling in the seventh grade, and currently is taking prescription medication to cope with the physical and mental impact of the harassment he is subjected to at school.  Taking the facts in the light most favorable to the non-moving party and making all reasonable inferences in the plaintiff's favor, the plaintiff has shown that the bullying D.W. experienced was severe and pervasive enough to alter the condition of his education and create an abusive educational environment.[15]  Therefore, the plaintiff has sufficiently met the third prong of the Davis test for purposes of summary judgment.

### iii. Was the Board deliberately indifferent to the bullying allegations made by D.W. and the plaintiff?

The plaintiff argues that the defendant responded to the bullying of D.W. with deliberate indifference because the Board "made no effort to investigate or put an end to the harassment and bullying...." (Doc. 60 p. 41).  The plaintiff argues that she and D.W. have complained about his being bullied each year that he has attended Blount County schools, beginning in kindergarten and continuing at least until his seventh grade year, when the briefing for this Motion for Summary Judgment was filed.[16]  (Doc. 60, pp. 39-40).  The standard for deliberate

---

[15]  This is not to say that every instance of alleged bullying is serious enough to warrant federal court intervention.  Some instances of alleged bullying and harassment are clearly trivial and amount to nothing more than the day-to-day annoyances all students must endure from time to time.  Nonetheless, there are other instances of physical abuse and almost continuous name-calling sufficient to raise a fact issue on this point.

[16]  The defendant argues that the plaintiff should be barred from arguing that she made multiple unsuccessful bullying complaints over the years because she failed to use the designated bullying complaint form found in the bullying policy she received every year from the Board.  (Doc. 37,

indifference, however, is a high one.  According to the Court in <u>Davis</u>, "recipients of federal funding may be liable for subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student... harassment and the harasser is under the school's disciplinary authority."  <u>Davis</u>, 526 U.S. at 646, 119 S. Ct. 1661, 143 L. Ed. 2d 839.  The Court clarified that funding recipients should be "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."  <u>Id.</u> at 648.

As part of the ALDE Administrative Record, the Board introduced exhibits from D.W.'s sixth grade to ninth grade years.  D.W. had an Individualized Education Program ("IEP") for each school year.  (Admin. Rec. 632, 637, 656, 668).  The "parental concerns" portion of the D.W.'s sixth grade IEP indicates that the plaintiff's only concern was that D.W. be able to check out the library books that he chose.  (Admin. Rec. 632).  The IEP also notes that "[o]n December 5th 2012 a safety plan was added to D's IEP."  (<u>Id.</u>)  The IEP was signed by the plaintiff on September 13, 2012, and it appears that the IEP was modified on December 5, 2012, after the safety plan was created.  (Admin. Rec. 636).  D.W.'s seventh grade IEP also notes that he had a safety plan.  (Admin. Rec. 637).  The 'parental' concerns section stated that the plaintiff "wants school to be a fun place for him to feel safe and to learn," and that she "wants to make certain that [D.W.] is always treated fairly."  (<u>Id.</u>)  The seventh grade IEP makes no mention of bullying, and is signed by the plaintiff on April 19, 2013.  (Admin. Rec. 643).  The plaintiff contends that

---

n. 5).  The court rejects this argument.  While it may be reasonable for a school board to establish a procedure for receiving and investigating complaints of peer harassment, that procedure cannot become a shield behind which the school board refuses to address problems actually known to it.

her statement regarding D.W.'s fair treatment and her desire that school is a place where D.W.

can feel safe is a statement on her concerns about bullying.

D.W.'s eighth grade IEP states that he "gets along well with peers in group work."

(Admin. Rec. 656).   The IEP includes the same statement regarding the plaintiff's wish that

D.W. be treated fairly and that school be "a fun place for him to feel safe and to learn."   (Id.)

The IEP was amended on March 23, 2015, and states as follows:

> The recent due process complaint filed by the parent/guardian stated a concern
> regarding "Bullying by peers and teachers".  [D.W.]'s IEP "safety plan" (which
> addresses the reported concerns of the parent/guardian and [D.W.] regarding
> bullying) was most recently reviewed and revised at the October 28, 2014 IEP
> meeting.  Since the time of the October 28, 2014 IEP meeting, [D.W.] has only
> reported incidences of bullying on October 28, 2014, November 4, 2014, and
> November 20, 2014.  No reports of bullying have been reported by [D.W.] or his
> parent/guardian since the November 20, 2014 report.  At today's IEP meeting,
> [D.W.] stated that the only other occasion that he has incurred bullying since
> November 20, 2014 was in p.e. class when someone had moved his notebook.
> [D.W.] could not remember the exact date(s) for this past incident and [D.W.] had
> not previously reported this concern to anyone at school.  [D.W.] further added at
> the meeting that he usually uses his designated p.e. period to work with the
> resource teacher on his math skills and thus he does not commonly attend p.e.
> class.   [D.W.] was also reminded of the importance of timely reporting any
> behaviors by others that he feels is bullying consistent with the provisions of the
> safety plan.... Following discussion of this issue, the IEP team offered a
> supplemental and expanded safety plan to the parent/guardian and [D.W.] at the
> meeting in writing in an attempt to respond to the concern noted in the due
> process complaint.  (See attached proposal).  The parent/guardian and [D.W.] did
> not conclude that any of the additional supports, evaluations, etc. offered by the
> IEP team were needed at this time.   Due to effectiveness of the current safety
> plan, the other members of the IEP team were in agreement.

(Admin. Rec. 656-657).  D.W.'s eighth grade IEP contains no signatures, but the IEP states that

the plaintiff, D.W.'s general and special education teachers, D.W.'s LEA representative, and the

student "attended and participated in the meeting to develop this IEP."  (Admin. Rec. 663).  The

eighth grade IEP also indicates that a copy of the IEP was not given to the plaintiff at the time of the meeting, but was sent to her on March 27, 2015, four days after the meeting.  (Id.)  This is consistent with the sixth and seventh grade IEPs.  D.W.'s ninth grade IEP states that he "generally gets along with his peers," but "can be taken advantage of by his peers at times." (Admin. Rec. 668).  The IEP contains the same statement by the plaintiff that she is concerned that D.W. always be treated fairly and that school is a place for him to have fun, feel safe, and learn.  (Id.)  The IEP also notes that D.W. "has been the subject of some bullying issues and therefore has a safety plan in place."  (Admin. Rec. 669).  The ninth grade IEP was signed by the plaintiff on April 28, 2015, and was sent to her on May 18, 2015.  (Admin. Rec. 678, 910).

The Administrative Record also includes copies of two Student Safety Plans ("Safety Plan") that have been put in place for D.W.  The first was created in his sixth grade year on December 5, 2012.  (Admin. Rec. 630-31, 855-86).  The Safety Plan acknowledges that the plaintiff has complained that D.W. is bullied at school, although the incidents had not been witnessed by school personnel.  (Admin. Rec. 630).  The following are some of the actions the Safety Plan indicates the school would implement to attempt to prevent any bullying experienced by D.W.:

- Create a "no contact" contract for the students involved in a given situation reported by D.W.;
- Contact the plaintiff if a report of bullying or an incident of violence occurs with D.W.;
- Provide D.W. with designated staff members to whom he should report incidents of bullying;
- Develop a relationship with D.W. so that he feels safe to report any incidents of bullying;
- Have the counselor and special education teacher check-in with D.W. on a regular basis to determine if he is experiencing any problems with bullying;
- Have the counselor speak with all students involved in any serious incidents;
- Have teachers report any actions that may be considered bullying to the school leadership or the school counselor.

(Admin. Rec. 630).  The Safety Plan was signed by the plaintiff on December 5, 2012.  (Admin. Rec. 631).  The plaintiff testified that, following the IEP meeting at which the Safety Plan was discussed and implemented, D.W. was provided with incident report forms and was instructed to fill them out and turn them in should any bullying incidents occur.[17]  (Doc. 61-1, p. 49).  The Safety Plan was amended on October 28, 2014, during D.W.'s eighth grade year.  (Admin. Rec. 666-67, 886-87).  The amended Safety Plan stated that D.W. should report any bullying incidents to the resource teacher, Tina Wynn, who would create an incident report and provide it to vice-principal Steven Bryson.  (Admin. Rec. 666).  The amended Safety Plan also specified that the school counselor would check-in with D.W. each Thursday morning to evaluate whether D.W. was having any problems and to help him develop self-advocacy skills.  (Admin. Rec. 666-67).  Otherwise, the Safety Plan remained largely unchanged.

Various incident reports are included throughout the ALDE Administrative Record.  An incident report was signed by D.W. on December 7, 2012, in which it is alleged that another student called D.W. a "dog killer" and that, when the student denied making the comment, the teacher, Mrs. Hailey told D.W. to "forget about it and seat [sic] down."  (Admin. Rec. 854).  Ms. Hailey responded to the report in writing, stating that she did not tell D.W. to "forget about it."  (Id.)  She said that she did not see the incident and could not prove anything happened, but that she told both D.W. and the other student "not to say anything if they couldn't say anything nice."

---

[17]    Although the plaintiff's briefs allege that the administration threw away D.W.'s bullying report forms, in her deposition she testifies that the forms D.W. attempted to turn in were illegible due to his dyslexia and difficulty writing.  Therefore, the office staff threw away the form D.W. had attempted to complete, and sent him home with another form for the plaintiff to help him complete.  (Sparman Depo., pp. 203-204, Doc. 61-1, p. 51).

(<u>Id.</u>)  Two more reports were submitted by D.W. on December 10, 2012, and December 13, 2012.  (Admin. Rec. 651-653).  The December 10 incident report alleges that when D.W. moved to pick up a marker that had landed on his desk, another student "hit [D.W.'s] finger on the desk and then punched him in the arm."  (Admin. Rec. 651, 853).  That student was moved to the other side of the room, away from D.W.  (<u>Id.</u>)  The teacher's report of the incident is included in the record.  (Admin. Rec. 870).  She confirms that the student was moved to the other side of the room.  (<u>Id.</u>)  D.W. later reported that the student called him a "tattle tale" and "cry baby" when he reported the behavior to the teacher.  The teacher reports that she did not see or hear that occur.  (<u>Id.</u>)  The December 13 report alleges that, during p.e. class, another student hit D.W. in the back of the head and "ran off."  (Admin. Rec. 652).  The report appears to say that the child was sent to the office.  (<u>Id.</u> at 653).

Another report documents a fight that happened between D.W. and another student at a football game on October 11, 2013.  (Admin. Rec. 796).  The report, completed on October 15, 2013, indicates that, while students were playing with a football outside the fieldhouse, another student knocked D.W. to the ground and punched him in the face.  (<u>Id.</u>)  The fight was broken up and the student was "assigned 2 days of In School Suspension for his action in this incident." (<u>Id.</u>)  The Discipline Report for the student is included in the Administrative Record.  (Admin. Rec. 797).  Another incident that has been made much of in the plaintiff's briefs, as well as at motion hearings, is the fact that, during his seventh grade year, D.W. was apparently "pantsed" several times.  A document in the Administrative Record, signed by Mr. Bryson on October 9, 2013, indicated that "pantsing" had become an issue among all of the seventh and eighth grade boys, and an assembly was held during which Mr. Bryson explained to the boys that pulling

down another student's pants could be considered sexual harassment and would result in punishment. (Admin. Rec. 798). D.W. reported on January 23, 2014, another incident on which he was called "dog killer." (Admin. Rec. 803). The investigation was documented, and the child said that, rather than calling D.W. a "dog killer" he asked about whether D.W.'s grandfather had killed a dog, but later apologized. (Id.) No witnesses to the event are noted. A report of the incident also is included in the record, and was signed and dated on April 10, 2014. (Admin. 804).

The Administrative Record includes six Complaint Report Forms ("CRF") completed by the plaintiff on behalf of D.W. The CRFs contain information similar to that included in the incident reports from earlier dates, but are specifically intended to report bullying, harassment, threats, and/or intimidation, and contain specific areas for a school official to report the action taken in response to the incident and the resolution. The earliest CRFs are from September 15, 2014. (Admin. Rec. 654, 655). The incidents occurred in the classroom and in the cafeteria. The resolution to the cafeteria incident was instructing the other student not to call D.W. names, especially regarding his weight. (Admin. Rec. 654). The resolution to the classroom incident was to instruct the other student not to take part in name-calling and not to throw things. (Admin. Rec. 655). On October 2, 2014, another incident in the cafeteria was reported on a CRF. (Admin. Rec. 664). The plaintiff alleges that another student hit D.W. in his ear. (Id.) The incident was verified by witnesses, and the other student was given detention along with being instructed to leave D.W. alone and avoid contact with him in the future. (Id.) A CRF completed on October 28, 2014, reported that a student was "annoying" D.W. by "following him" everywhere. (Admin. Rec. 644). Also on the CRF, D.W. reported that he had not

experienced any physical harassment for "a while."  (Id.)  D.W. reported that the action had stopped after the other student was given a series of Alternative Behavior Education sessions, and a note was made to follow-up with D.W. regarding the effectiveness of the solution.  (Id.) Another CRF stated that on November 4, 2014, a student with whom D.W. previously had problems sat next to him in the cafeteria and in a classroom.  (Admin. Rec. 645).  Teachers were instructed to keep the two students separated.  (Id.)  The CRF completed on November 20, 2014, reports that a student shoved and cursed D.W. after D.W. fell and landed on the student while playing tag.  (Admin. Rec. 646).  The resolution portion of the form indicates that no previous problems had occurred between the two students and that the boys had been instructed to refrain from engaging in dangerous horseplay.  (Id.)

On October 16, 2014, Steven Bryson emailed several teachers informing them that "there are some bullying allegations from D.W. about E.S.[18]"  (Admin. Rec. 805).   The e-mail asked that those students be observed especially closely and that any problems be reported immediately.  (Id.)  Several other incidents and their resolutions are reported throughout the Administrative record in what appear to be informal typed reports.  These notes range from early 2012 to early 2014.  (Admin. Rec. 800, 859, 867-878).  Based on the Administrative Record, it appears that the Board investigated and dealt with each incident reported by D.W. or the plaintiff.  When it was impossible to prove that an incident occurred, the students allegedly involved still were counseled regarding appropriate behavior.

---

[18]   The student E.S. appears to be the source of many of D.W.'s problems.  He is the student identified by plaintiff as one of D.W.'s main harassers since kindergarten.  He appears in several complaint forms, calling D.W. a "dog killer," shoving him, and hitting him in the back.

Based on the evidence set out in the administrative record and in the discovery record in this action, the court cannot find that there is substantial evidence Board was deliberately indifferent to any harassment or abuse suffered by D.W.  The plaintiff, in her deposition and in her briefs and pleadings, argues that despite the copious meetings, the provision of complaint forms, and the implementation of two safety plans, the defendant did nothing to stop or prevent D.W. from being bullied.  To show a genuine issue of fact as to whether the defendant was deliberately indifferent, it is not enough to show simply that the defendant did not succeed in stopping all harassment D.W. was experiencing.  Rather, plaintiff must present substantial evidence that the defendant responded to the bullying and harassment in a way that was clearly unreasonable under the known circumstances.  See Hill v. Cundiff, 797 F.3d 948, 973 (11th Cir. 2015)(In the context of an analogous Title IX student-on-student sexual harassment claim, the court of appeals said, "[F]unding recipients are deliberately indifferent 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'")(quoting Davis, 526 U.S. at 648).  "To survive a summary judgment motion, a Title IX plaintiff must present evidence from which a reasonable jury could conclude 'the Title IX recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination.'"  Hill v. Cundiff, 797 F.3d 948, 973 (11th Cir. 2015)(quoting Williams v. Board of Regents of University System of Georgia, 477 F.3d 1282, 1296 (11th Cir.2007)).

The responses by the defendant to D.W. and his grandmother's reports and complaints of bullying was not unreasonable.  There is evidence that, as part of D.W.'s IEP, a specific safety plan was put into place and D.W. was given incident report or complaint forms to report any

situation in which he felt bullied.  He also was provided with a teacher liaison of his choosing to whom he could report bullying and who would pass those reports on to the administration.  The record shows that in instances where D.W. reported being bullied, harmed, or harassed, the incident was investigated and, if the incident was supported by witnesses or was otherwise proven to have occurred, the perpetrating students were punished.  In any event, the record shows that even when the occurrences could not be proven, the students alleged to be involved were counseled regarding appropriate behavior.  While the plaintiff believes that the measures taken by the defendant have not been successful and is understandably upset by that, none of the evidence set out illustrates responses by the defendant that are clearly unreasonable under the known circumstances.  Neither the ADA nor the Rehabilitation Act requires the school board to ensure that absolutely no disability-based harassment or bullying occur; that is an impossible burden.  Federal law requires that the defendant board of education take reasonable steps to prevent and protect vulnerable students from suffering such harassment.  Even if the plaintiff is correct that these measures are having absolutely no effect,[19] the defendant has not failed to respond to the harassment, as the plaintiff alleges.

---

[19]  It is perhaps worth noting that the plaintiff has not suggested other steps the defendant could have taken to protect D.W. from harassment.  Given that the defendant school board has the duty to education "even the most troublesome and defiant students," Hill v. Cundiff, 797 F.3d 948, 969 (11th Cir. 2015), there is only a limited range of options available to deal with such immature students harassing others.  The board undertook to provide D.W. with a specially tailored safety plan, and it disciplined those students it determined had bullied him.  It is not unreasonable for the defendant board to hesitate to discipline students it *cannot* determine harassed D.W, given the rights of those students to be free from false accusations.  Even when discipline was not imposed, teachers and administrators counseled students about the evils of harassment and required them to avoid engaging in it.  It is not apparent to the court what else the defendant could have done.

Although the plaintiff disputes the effect of the evidence set out by the defendant and certainly disputes the efficacy of the measures taken, her dispute alone is not enough to create a question of material fact for purposes of summary judgment.  To rebut the motion, the plaintiff "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The plaintiff does not offer evidence of significant probative value to dispute the documentary evidence produced by the defendant. To support her claim, she offers her own deposition, her own affidavit, the affidavit of D.W., a psychological evaluation of D.W., a doctor's note from an ENT, police reports she filed, notes and emails from members of the administration, and a resolution agreement lacking the plaintiff's signature.  None of the evidence submitted by the plaintiff creates a question of material fact regarding the defendant's response to the bullying of D.W. and her complaints thereof, nor does it indicate that circumstances rendered those responses unreasonable.  Evidence that is merely colorable or not significantly probative does not preclude summary judgment.  See Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Based on the foregoing, the court finds that the defendant's Motion for Summary Judgment as to the plaintiff's claims of peer-on-peer harassment pursuant to the ADA and § 504 of the Rehabilitation Act is due to be GRANTED.

### b.  Harassment by Teachers

As part of the ADA and § 504 claim, the plaintiff alleges that teachers, as well as students, harass D.W. at school.  The plaintiff includes in her Amended Complaint three examples of alleged harassment of D.W. by teachers.  The first example of the alleged

harassment occurred in D.W.'s fifth or sixth grade year.  The entire class had been taken to the

high school for a beauty pageant rehearsal.  (Sparman, Depo., p. 17, Doc. 61-1, p. 5).  D.W. was

standing with some other boys in the back of the auditorium, and D.W. was trying to show the

other boys how to whistle.[20]  (Id.)  A teacher, Ms. Darnell, came over to the boys and told them

to be quiet.  (Id.)  While doing so, she "yanked [D.W.] to the side.  And when she did, she

dislocated his shoulder."  (Id.)  The plaintiff testified that D.W. had to go see a specialist.

(Sparman, Depo., p. 18).  She reported the incident to Ms. Lakey, the principal of Blountsville

Elementary School at the time.  (Id. at 19-20).  Although the plaintiff followed-up with Ms.

Lakey about the incident, Ms. Lakey would give the plaintiff no details beyond assuring her that

she had "taken care of" the situation.  (Id. at 21).  The plaintiff has presented no evidence that

this incident actually occurred,[21] other than her own deposition testimony of what she says D.W.

told her.[22]

        The plaintiff testified that she witnessed the second incident of teacher harassment.  She

was present at D.W.'s school field day and D.W. suffered an asthma attack.  The plaintiff

---

[20]   In other parts of the record, including the administrative record, it is reported that when this incident occurred, D.W. was not whistling, but humming as a response to an asthma attack. D.W. did not stop humming when the teacher told the boys to be quiet, because he was responding to the asthma attack in a way that his doctor had instructed him.  However, in Ms. Sparman's deposition, her testimony is that he was showing the other boys how to whistle.

[21]   A doctor's note restricting D.W.'s activities for two weeks was discussed during the plaintiff's deposition (Sparman, Depo., p. 24), but the court has not seen the note or any other medical record regarding the dislocation of D.W.'s shoulder.

[22]   As a part of the evidentiary material submitted in opposition to the Motion for Summary Judgment, the plaintiff includes an affidavit by D.W.  (Doc. 61-3).  In the affidavit, D.W. refers only to peer-on-peer harassment and that his teachers told him not to be a "tattletale" and did nothing to stop the bullying.  D.W.'s affidavit makes no mention of the three situations of teacher-on-student harassment alleged by the plaintiff.

testified that he asked the substitute teacher, Ms. Smith, for permission to go get his inhaler. According to the plaintiff, Ms. Smith told D.W. to "shut up and sit down."  (Sparman Depo., p. 25).  Sparman testified that she then confronted Ms. Smith, informing her that D.W. suffers from asthma and must be allowed to get his inhaler.  (Id.)  Ms. Smith did not respond, and D.W. and his mother went to get his inhaler.  (Id. at 26).  The plaintiff said she later spoke to Mr. Clay, the assistant principal, about the matter, and he indicated that he would look into it.  Later, both Mr. Clay and Ms. Lakey told the plaintiff everything had been taken care of.  (Id. at 37-38).

As for the third incident, the plaintiff claims that, on one occasion, D.W. was denied his inhaler during p.e. class by Coach Morton.  (Id. at 47-48).  This incident was reported to the plaintiff by D.W., as she was not present during the school day.  (Id.)  However, D.W. did use his inhaler after p.e. class.  (Id. at 50).  The plaintiff reported the incident to Ms. Lakey the next day, and afterword she spoke to Coach Morton directly regarding the incident.  (Id. at 51-52).  Coach Morton told her that he "had too many kids" and "didn't know which kids had asthma, he didn't know which kid needed what."  (Id. at 52).

The plaintiff's allegations regarding teachers are addressed by Lakey's affidavit.[23]  (Doc. 52-10).  In her affidavit, Lakey states:

> I have reviewed the specific allegations of bullying made by Ms. Sparman in her complaint and amended complaint.  In particular, Ms. Sparman alleges three specific incidents involving teachers or staff occurring on [sic] February 2012 (teacher allegedly yanked [D.W.]'s arm), May 2012 (substitute teacher allegedly told [D.W.] to shut up and sit down when [D.W] alerted her of an asthma attack, and October 2012 (a P.E. teacher would not allow [D.W.] to take a

---

[23]   The affidavit of Shannon Lynn Lakey was the subject of a Motion to Strike which was granted in part and denied in part.  (Doc. 67).  No portion of the affidavit that was stricken by the court's order has been included in this memorandum opinion or considered in the court's determination of this Motion for Summary Judgment.

break to use his inhaler.  Although Ms. Sparman did not make a complaint of bullying on the Board's required form, each of these allegations was reviewed by me as the school principal when Ms. Sparman informally made me aware of the allegations.  I discussed the allegations with the specific staff member at issue.... Likewise, in regard to the two other allegations, I found no support whatsoever to substantiate the parent's allegations.  Neither Ms. Sparman nor [D.W.] reported any witnesses to these incidents.  I was unable to locate any witnesses.

I further point out that in my opinion, these three allegations made against staff members by Ms. Sparman in her complaint and amended complaint would not rise to the level of "bullying" as defined by the Board's policy.  Moreover, at the time of these alleged incidents, Ms. Sparman failed to even properly make a report of bullying under the Board's policy due to her failure to utilize the required bullying reporting form.  However, I still investigated the allegations because even though the allegations did not rise to the level of bullying, such incidences if true would be of a significant concern to me that I would address through other school policies, strategies, and procedures.

(Lakey Aff., doc. 52-10, p. 3).

The plaintiff has provided no documentation, beyond her own deposition, that the incidents complained-of actually occurred, nor is there any evidence presented contradicting Lakey's statement in her affidavit that the incidents were investigated.  In order to survive a motion for summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004).

But even if these incidences did occur, they fail to establish sufficiently "severe" or "pervasive" harassment or discrimination.   Plaintiff's own version of the whistling episode shows that it was a disciplinary matter, completely unrelated to D.W.'s asthma.   The other episodes were isolated events, quickly corrected.   These events did not effectively prevent D.W. from receiving the benefits of the federally funded educational opportunities at school.   The plaintiff has not met that burden with regard to her claims of teacher-on-student harassment of D.W.   Accordingly, the Motion for Summary Judgment as it relates to the plaintiff's claims of teacher-on-student harassment is due to be GRANTED.

## II.      42 U.S.C.  § 1983

The plaintiff asserts that "systematic bullying at the hands of D.W.'s classmates and peers" served to deprive D.W. of his right to an education free from discriminatory practices and his right to bodily integrity.   (Doc. 25, ¶¶ 56-57).   The defendant argues in the Motion for Summary Judgment that the due process clause of § 1983 is not applicable to the plaintiff's claim and, even if it were, insufficient evidence has been offered to support a claim under § 1983. (Doc. 51-1, pp. 38-41).

At the outset, it is clear that, to the extent plaintiff is attempting to assert her ADA and Rehabilitation Act claims under 42 U.S.C. § 1983, she cannot do so.   The Eleventh Circuit has rejected the argument that because the rights created under the ADA and the Rehabilitation Act are federal, they can form the basis of a § 1983 claim.   "[A] plaintiff may not maintain a section 1983 action in lieu of--or in addition to--a Rehabilitation Act or ADA cause of action if the only alleged deprivation is of the [plainitff's] rights created by the Rehabilitation Act and the ADA."

Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1531 (11th Cir. 1997); see also Badillo v. Thorpe, 158 F. App'x 208 (11th Cir. 2005).

With respect to plaintiff's claim to violation of D.W.'s constitutional right to bodily integrity, the Eleventh Circuit Court of Appeals addressed the applicability of § 1983 in the public school setting in Davis v. Carter, stating

> "[T]he Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." County of Sacramento v. Lewis, 523 U.S. 833, 86, 118 S. Ct. 1708, 1716, 140 L. Ed. 2d 1043 (1998) (internal quotations and citations omitted). The substantive component of the Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331, 106 S. Ct. 662, 665, 88 L. Ed. 2d 662 (1986)).

> "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 195, 109 S. Ct. 998, 1003, 103 L. Ed. 2d 249 (1989). In DeShaney, the Supreme Court expressly rejected the argument that a constitutional duty of protection can arise from a state's "special relationship" with a particular individual where the state played no part in creating the danger posed to the individual. Id. at 197, 109 S. Ct. at 1002.[2]

Davis v. Carter, 555 F.3d 979, 981-82, (11th Cir. 2009). The court goes on to state that:

> A duty of protection can arise where the state has a custodial relationship with the individual, arising from such circumstances as incarceration in prison or involuntary commitment in a mental institution. Id. at 198-99, 109 S. Ct. at 1004-05. Voluntary attendance at a school event does not create a custodial relationship with the school sufficient to give rise to a constitutional duty of protection. Wright v. Lovin, 32 F.3d 538, 540 (11th Cir. 1994). Even compulsory school attendance laws do not constitute a restraint on personal

liberty sufficient to give rise to such an affirmative duty.  Wyke v. Polk County
Sch. Bd., 129 F.3d 560, 569 (11th Cir. 1997).

Davis, 555 F.3d at 984 n. 2.

The majority of actions at issue in the instant case were taken by private actors – other students.  Accordingly, § 1983 does not impose upon the defendant board of education a duty to protect D.W. against the actions of the other students.  Furthermore, compulsory school attendance does not create the type of custodial relationship that could serve to create a "special relationship" imposing a duty of protection.  See Wyke, *supra*.  To the extent the plaintiff argues that the defendant's failure to put a halt to all bullying or harassment activity serves as the creation of a danger under Davis v. Carter, the court disagrees.  As discussed with regard to the plaintiff's ADA and § 504 claims, the defendant responded reasonably to complaints and reports of bullying and, therefore, the defendant cannot be said to have "created" the danger of bullying. To so hold would effectively conclude that by serving its function—to facilitate the running of schools—a school board creates a danger.  The court is not willing to make such a determination.

With regard to the plaintiff's allegations against non-student actors—teachers, administrators, and the Board itself—such actions also are addressed in Davis v. Carter.  For purposes of this Order, the court is willing to assume without deciding that action taken by teachers, administrators, and the Board constitutes conduct by a government actor for purposes of § 1983.  The Eleventh Circuit had the following to say about such actions:

> Conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience-shocking in a constitutional sense.  See Lewis, 523 U.S. at 847, 118 S. Ct. at 1717.  The concept of conscience-shocking conduct "duplicates no traditional category of

common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." Id. at 848, 118 S. Ct. at 1717. The Supreme Court has made clear "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." Id. Thus, "the Fourteenth Amendment is not a 'font of tort law' that can be used, through section 1983, to convert state tort claims into federal causes of action." Neal v. Fulton County Bd. of Educ., 229 F.3d 1069, 1074 (11th Cir. 2000) (citing Lewis, 523 U.S. at 848, 118 S. Ct. at 1718). To rise to the conscience-shocking level, conduct most likely must be "intended to injure in some way unjustifiable by any government interest[.]" Lewis, 523 U.S. at 849, 118 S. Ct. at 1718.

It is illustrative to review cases in the school setting where we have applied these principles. In Neal, the court concluded a high school coach's conduct rose to the level of a constitutional violation. 229 F.3d at 1076. There, the coach intentionally struck a student with a metal weight lock, knocking the student's eye out of its socket, as a form of punishment for his involvement in a fight with another student. Id. at 1071. In finding a violation of the student's substantive due process rights, the court reasoned that the school official "intentionally us[ed] an obviously excessive amount of force that presented a reasonably foreseeable risk of serious bodily injury." Id. at 1076. Importantly, it made clear the claims of excessive corporal punishment shaped the outcome. Id. Similarly, in Kirkland v. Greene County Board of Education, 347 F.3d 903 (11th Cir. 2003), the court concluded a high school principal violated a student's constitutional rights after he struck the student with a metal cane in the head, ribs, and back for disciplinary reasons. Id. at 904-05.

In two other cases, we held the facts alleged did not constitute a substantive due process violation because they did not shock the conscience. In Dacosta v. Nwachukwa, 304 F.3d 1045 (11th Cir. 2002), a college student, Melanie Dacosta, brought a § 1983 claim against her instructor. Id. at 1047. Dacosta had followed her instructor out of the classroom after the instructor ignored Dacosta's question in class. Id. The instructor then darted back inside the class and slammed the door on Dacosta, which caused her arm to shatter the glass window of the door and become lodged in the glass pane. Id. After the instructor unsuccessfully tried to knock Dacosta back from the door by swinging it violently several times, he reached through the cracked pane and shoved Dacosta's face. Id. The court held the district court erred in denying the instructor's claim of qualified immunity because the complaint alleged no more than the tort of battery, which is insufficient to reach constitutional proportions. Id. at 1049.

In Nix v. Franklin County School District, 311 F.3d 1373 (11th Cir. 2002), a high school teacher instructed his students to hold on to a live wire during a voltage-reading demonstration in his electromechanical class. Id. at 1374. He informed

his students that they might die if they accidentally touched the exposed part of the wire.  Id.  The teacher increased the power to the wire, turned away to answer a question, and turned back to find a student who had touched the wire gasping for breath.  Id.  After the student died, his parents brought a § 1983 suit and alleged "the actions of the defendants 'were particularly arbitrary, reckless, and deliberately indifferent.'"  Id. at 1376.  The court emphasized that mere negligence is insufficient to sustain a constitutional claim, while actions intended to injure and that are unrelated to any governmental interest are likely to rise to the conscience-shocking level.  Id. at 1375.  In denying relief to the plaintiffs, the court characterized its precedents as "explicit in stating that 'deliberate indifference' is insufficient to constitute a due-process violation in a non-custodial setting."[3]  Id. at 1377.  The court further pointed out that "[o]nly in the limited context of due process claims based on excessive corporal punishment has this court held that the intentional conduct of a high-school educator may shock the conscience."  Id. at 1378 (discussing Neal, 229 F.3d 1069).

Davis v. Carter, 555 F.3d 979, 982-83, 984 n. 3 (11th Cir. 2009)[24].

Even if the court determined that the Board did absolutely nothing with regard to the plaintiff and D.W.'s complaints of bullying (a conclusion unsupported by the evidence, *supra*), the behavior would not rise to the level of "conscience-shocking" as is required by the finding in Davis v. Carter.  Furthermore, if the court also were to presume that all of the plaintiff's allegations of harassment by teachers were true (again, a conclusion unsupported by the evidence, *supra*) those instances still do not rise to the level of actions that are shocking to the conscience.  Under the standard set out by the Eleventh Circuit in Davis v. Carter, the plaintiff

---

[24]  Footnote 3 in Nix v. Franklin County School District, reads as follows:

A year after Nix, the court suggested "[i]n some cases, a state official's deliberate indifference [to an extremely great risk of injury] will establish a substantive due process violation."  Waddell v. Hendry County Sheriff's Office, 329 F.3d 1300, 1306 (11th Cir. 2003).  The incident in Waddell did not take place in the school setting, and the court did not rule out that "the correct legal threshold for substantive due process liability... is actually far higher."  Id. at 1306 n. 5.

has failed to set forth evidence to support a claim for violation of D.W.'s due process rights under § 1983. Accordingly, the Motion for Summary judgment with regard to the plaintiff's claim pursuant to 42 U.S.C. § 1983 is due to be GRANTED.

### III.    Loss of Consortium

On her own behalf, the plaintiff asserts a claim of loss of consortium as a part of her claims under the ADA, § 504, and § 1983. Because that claim was not addressed in the Motion for Summary Judgment, the parties were notified that the court intended to take the issue up as part of the pending Motion for Summary Judgment, as allowed by Rule 56(f) of the Federal Rules of Civil Procedure. (Doc. 89). The parties were allowed sufficient time to brief the issue. Under Alabama law, a claim for loss of consortium is derivative to the claim of the injured party, here, D.W. Because the claims raised on behalf of D.W. fail, the plaintiff's loss of consortium claim necessarily fails also. See Ex parte Progress Rail Servs. Corp., 869 So. 2d 459, 462 (Ala. 2003) ("Even if the claims alleging loss of consortium and loss of services could otherwise be legally cognizable, they are derivative of, and dependent upon the outcome of, the direct claim...."). Therefore, the Motion for Summary Judgment as to the plaintiff's loss of consortium claim is due to be GRANTED.

### CONCLUSION

For the reasons stated herein, the defendant's Motion for Summary Judgment (doc. 50) is due to be GRANTED, and all claims asserted in the above-styled action are due to be

DISMISSED WITH PREJUDICE.   A final Order of Judgment will be entered contemporaneously herewith.

DATED this 19th day of September, 2016.

_____

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE